# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **PRESTRESS SERVICES INDUSTRIES, LLC**<br>250 North Hartford Ave.<br>Columbus, Ohio 43222,<br><br>  Plaintiff,<br><br>  vs.<br><br>**CITY OF WESTLAKE, OHIO**<br>27700 Hilliard Boulevard<br>Westlake, Ohio 44145,<br><br>  and<br><br>**DONALD P. GRAYEM**, in his individual and official capacities,<br>City of Westlake, Ohio<br>27700 Hilliard Boulevard<br>Westlake, Ohio 44145,<br><br>  and<br><br>**ROBERT P. KELLY**, in his individual and official capacities,<br>City of Westlake, Ohio<br>27700 Hilliard Boulevard<br>Westlake, Ohio 44145,<br><br>  and<br><br>**ROBERT L. STARK ENTERPRISES, INC.**<br>c/o Robert L. Stark<br>629 Euclid Ave., Suite 1300<br>Cleveland, Ohio 44114,<br><br>  and<br><br>**ARBOR CONSTRUCTION CO., INC.**<br>c/o Robert L. Stark<br>629 Euclid Ave., Suite 1300<br>Cleveland, Ohio 44114, | **CASE NO:** _____<br><br>**JUDGE** _____<br><br><br><br>**<u>JURY DEMAND ENDORSED HEREON</u>** |

|  |  |
|---|---|
| and | : |
|  | : |
| **CROCKER PARK PHASE III, LLC** | : |
| c/o Robert L. Stark Enterprises, Inc. | : |
| 629 Euclid Ave., Suite 1300 | : |
| Cleveland, Ohio 44114, | : |
|  | : |
| and | : |
|  | : |
| **CROCKER PARK, LLC** | : |
| c/o Robert L. Stark | : |
| 629 Euclid Ave., Suite 1300 | : |
| Cleveland, Ohio 44114, | : |
|  | : |
| and | : |
|  | : |
| **JOHN DOES AND JANE DOES**, specific identities and addresses unknown, | : |
|  | : |
| Defendants. | : |

## COMPLAINT

For its Complaint against Defendants City of Westlake, Ohio, and its employees Donald P. Grayem and Robert P. Kelly, in their individual and official capacities, Robert L. Stark Enterprises, Inc. ("Stark"), Arbor Construction Co., Inc. ("Arbor"), Crocker Park Phase III, LLC ("CPIII"), Crocker Park, LLC ("CP"), and John Does and Jane Does, employees of the City, Stark, Arbor, CPIII and/or CP (collectively, "Defendants"), Prestress Services Industries, LLC states as follows:

### THE PARTIES AND VENUE

1. Prestress Services Industries, LLC ("Plaintiff" or "PSI") is a limited liability company organized and existing under the laws of the State of Ohio with its principal place of business in Columbus, Ohio, and being engaged in the manufacture of precast concrete.

2. The City of Westlake, Ohio ("City") is a municipal corporation organized and existing under the laws of the State of Ohio.

2

3. Defendant Donald P. Grayem ("Grayem") is and at all times relevant to this Complaint the Director of Inspections, Chief Building Official, for the City of Westlake. Grayem is sued in his individual and official capacities.

4. Defendant Robert P. Kelly ("Kelly") is and at all times relevant to this Complaint the Director of the Department of Engineering for the City of Westlake. Kelly is sued in his individual and official capacities.

5. Defendant Robert L. Stark Enterprises, Inc. ("Stark") is a for profit corporation organized and existing under the laws of the State of Ohio, having its principal office in Cuyahoga County, Ohio, and being engaged in the business of real estate development.

6. Arbor Construction Co., Inc. ("Arbor") is a for profit corporation organized and existing under the laws of the State of Ohio, owned and controlled by Defendant Stark, and used on the Project for the purpose of the management of the Project and the construction of certain private improvements being constructed thereon

7. Crocker Park Phase III, LLC ("CPIII") is a limited liability company organized and existing under the laws of the State of Ohio, owned and/or controlled by Defendant Stark, and used for the single purpose of the participation of Defendant Stark as an owner in the Project, with its principal place of business in the offices of Defendant Stark.

8. Crocker Park, LLC ("CP") is a limited liability company organized and existing under the laws of the State of Ohio, owned and/or controlled by Defendant Stark, and used for the single purpose of performing the role of Construction Agent on the Project, with its principal place of business in the offices of Defendant Stark.

9. Defendants John Does and Jane Roes are individuals whose specific identities and addresses are presently unknown, who are or were employed by the City, Stark, Arbor, CPIII

and/or CP who had supervisory authority over Defendants, and who conspired with other Defendants and/or directly engaged in the wrongful actions and course of conduct alleged herein.

10. At all relevant times, Defendants City, Kelly and Grayem acted under color of State law.

11. This Court has jurisdiction over this Complaint under 28 U.S.C. § 1331 because PSI's claims arise under 42 U.S.C. § 1983, and this Court has supplemental jurisdiction over the State law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

12. Venue is proper in this Court because Defendants are located in Cuyahoga County, Ohio, and the events giving rise to this Complaint took place in Cuyahoga County, in the Northern District of Ohio.

## NATURE OF THE CASE

13. This case arises out of Defendants' ongoing conspiracy to fabricate a $10,695,000 liquidated damages claim as leverage to extract financial concessions from the general contractor and its subcontractors, including the Plaintiff herein, on the $100 Million Crocker Park development in the City of Westlake, Ohio. Specifically, Defendants conspired to cause the City of Westlake Building Department, and its Chief Building Official, to illegally withhold the issuance of a Certificate of Occupancy for a portion of the Project so as to improperly support the assessment of liquidated damages of $31,000 per day for 345 days.

14. The construction project that is the subject of this case included the construction of Phase III of the Crocker Park development (the "Project"). This development was undertaken as a Public-Private partnership between Defendant City, the developer (Defendant Stark) and American Greetings Corp. (the "Ownership Group"). The scope of the Project included both public and private work, and is described as a "mixed use lifestyle center" located on 88 acres in

Westlake, Ohio. Among other elements, the Project included various retail buildings, a hotel, residential apartments, a public space known as "Market Square", three parking garages and the new American Greetings' corporate headquarters building.

15. For the purpose of fulfilling its obligations under the development agreement with Defendant City and American Greetings, Stark formed several single purpose entities (hereinafter the individual Stark controlled Defendants may be collectively referred to as "Stark"). Specifically, Stark organized Defendant CPIII to act as its "Owner" entity with Defendant City and American Greetings. Stark also organized Defendant CP to undertake the role of the Construction Agent to manage the physical construction of significant aspects of the Project, and organized Defendant Arbor for the purpose of helping CP manage the Project and undertake the construction of certain portions of the private improvements. Defendant City, Defendant CPIII and American Greetings entered into a contract with Defendant CP to perform the services of Construction Agent.

16. As organized by the Ownership Group, the Project was to be constructed by a construction manager/general contractor under a Construction Manager At Risk Contract ("CMR Contract"). The Ownership Group, as required by law, put the CMR Contract out for public bid. Panzica Construction Company ("PCC") was ultimately declared to be the successful bidder for the Project. CP then entered into the CMR Contract with PCC, pursuant to which PCC was to undertake the physical construction of all elements of the Project, with the exception of the construction of the American Greetings' office complex (the "CMR Contract").

17. As noted above, the scope of the Project included three parking garages known as Garages F, G and H. PCC entered into a subcontract with Plaintiff PSI pursuant to which PSI was to design, fabricate and erect the precast concrete members that form the structure of the garages.

18. The form of contract between CP and PCC included provisions pursuant to which liquidated damages of $31,000 per day could be assessed by CP against PCC in the event that there were delays to the completion of the work with respect to certain identified "Milestones".

19. More specifically, Article 8.7.1 of the General Conditions of the CMR Contract allowed CPIII to assess $31,000 for each day that PCC failed to achieve a "Milestone" date, being therein defined as "[A] principal event specified in the Contract Documents relating to an intermediate date or time prior to Final Acceptance of all of the Work".

20. In the event of the assessment of liquidated damages, any such amount would be distributed $30,000 per day to Stark and $1,000 per day to the City.

21. The CMR Contract required that PCC, as the CMR Contractor, incorporate certain terms into its subcontracts and gave Defendant City, Defendant Crocker and/or Defendant CP the authority to approve the terms of each subcontract.

22. The subcontract between PCC and PSI purported to give PCC the right to "pass-through" to PSI liquidated damages assessed by CP under certain circumstances.

23. The original bid documents published by the Ownership Group did not include any Milestone dates. Subsequently, the Ownership Group published an Addendum to the bid documents that established certain Milestone dates. The first identified Milestone was the execution of the CMR Contract on December 16, 2013. The third Milestone Date identified was the issuance of the Certificate of Occupancy for the first of the three garages (Garage F) on September 29, 2014.

24. For reasons unknown to PSI, the execution of the CMR Contract by CP and PCC was delayed for 100 days. This delay, in turn, prohibited the start of work by PCC and the subcontractors, including PSI, for a like period of time. Despite the clear requirements of the

contract, however, CP did not generate or have executed any change order to the CMR Contract to properly adjust any of the other affected Milestone dates, including specifically the third Milestone date requiring the issuance of a Certificate of Occupancy for Garage F by September 29, 2014. Likewise, neither the Ownership Group, nor CP, ever issued a new Milestone schedule.

25. By February, 2015, approximately 12 months after physical construction work on the Project had begun, many elements of the work on the Project had been advanced. By that point in time, the Ownership Group and CP had become aware that PCC had a number of significant claims for additional costs that had been incurred due to changes made to the Project by the Ownership Group and/or time impacts to the work.

26. In addition to the claims of PCC for additional compensation related to changes in the Project made by Defendants, in October, 2016, PSI presented a claim for additional compensation in the amount of $1,550,382 relating to changes made by Defendants to the design of Garage H on the Project.

27. The City Building Department is responsible for the issuance of the Certificate of Occupancy for all buildings within the City of Westlake. It is a violation of the Ohio Building Code for actual occupancy of a building to take place without the issuance of a Certificate of Occupancy.

28. It is the legal duty of the Chief Building Official under the Ohio Building Code to issue the Certificate of Occupancy as soon as the building is entitled to it. *See* OBC Section 111.

29. The Chief Building Official is the only individual employed by the City with the authority to issue a Certificate of Occupancy relating to structures within the City. Defendant Grayem was the Chief Building Official with respect to the Project and the legal duty to issue Certificates of Occupancy relating thereto, including for Garage F, was exclusively his to perform.

30. By March 10, 2016, the City, CPIII and CP had opened five of the six floors of Garage F for actual occupancy and use. Defendant Grayem previously testified under oath that as of that date, all life safety requirements had been met and that he would not have permitted such occupancy if the status of the work did not warrant it. He further testified that this was the first time in his 26 year career that he had allowed such occupancy without issuing the Certificate of Occupancy that was warranted. When asked why he had not proceeded with the issuance of the Certificate of Occupancy, he asserted that that was done "based upon discussions". He would not, however, identify who the discussions were with or what their content was.

31. Defendants, and each of them, agreed to proceed with their occupancy of Garage F without the issuance of the required Certificate of Occupancy and thereafter permitted and allowed that occupancy to continue for approximately 345 days without the Chief Building Official, Defendant Grayem, or the City Building Department issuing the required Certificate of Occupancy. Defendants, and each of them, continued the occupancy of Garage F without a Certificate of Occupancy until Defendant City, through Defendant Grayem, finally issued it on January 29, 2016, 325 days after the actual occupancy by Defendants began.

32. The primary effect of taking occupancy, but not issuing the Certificate of Occupancy, was to allow the bogus liquidated damages claim to run up at $31,000 per day.

33. In 2015 and 2016, representatives of the City, Stark, Arbor, CPIII and CP conspired to use the liquidated damages claim as leverage against PCC to extract financial concessions from PCC and PSI.

34. In February, 2017, Defendants CP and CPIII filed a complaint in the Cuyahoga County Court of Common Pleas in which they brought claims against both Defendant City and PCC (the "State Court Litigation"). Defendants' complaint as to PCC asserted a singular claim

8

predicated upon the fraudulent liquidated damages claim in an unspecified total amount based upon the $31,000 per day liquidated damages amount and the false allegation that a February 18, 2015, Milestone Date existed for Garage F.

35. In April, 2018, after, or as part of, the settlement of the claims asserted between Defendant City and Defendants CP and CPIII, and with the assistance of their respective legal counsel, Defendants filed an amended complaint in which they realigned themselves as Plaintiffs and in which they again presented the fraudulent liquidated damages claim against PCC. Specifically, Defendants conspired to present a liquidated damages claim based upon the assessment of the contractual $31,000 per day for 345 days, which number of days they calculated to have begun on a fraudulently created February 18, 2015, "Milestone Date" for the issuance of the Certificate of Occupancy for Garage F and running through the date that the City Building Department (Defendant Grayem) finally issued the Certificate of Occupancy – i.e. the entire period during which the Chief Building Official for the City illegally failed to issue the Certificate of Occupancy. This liquidated damages claim, as set forth in Defendants' amended complaint, was in the amount of $10,695,000.

36. The Department of Engineering for the City is charged with the duty to properly administer the engineering functions relating to the construction of projects within the City. At all times relevant to the Project, Defendant Kelly was the Director of the Department of Engineering for the City and as such was charged with the duty to properly address engineering issues on behalf of the City. In addition, Mr. Kelly was designated by the City as its Project Representative and was charged with the responsibility of overall management of the Project on behalf of the City.

37. During the Project, the City Department of Engineering, by and through Defendant Kelly, intentionally and improperly supported the use of the fraudulent liquidated damages claim as leverage against PCC and PSI.

38. The intent and purpose of Defendants' conspiracy and conduct in trumping up and asserting the fraudulent liquidated damages claim was solely to gain financial leverage over PCC and PSI relative to their respective claims for additional compensation related to the changes and delays to the Project for which Defendants were financially responsible and/or to improperly collect the liquidated damages for their own financial gain and benefit.

39. Subsequent to the filing of the amended complaint, PCC filed one or more third party complaints against PSI pursuant to which it sought to "pass through" to PSI the entire liability for Defendants' fraudulent liquidated damages claim.

40. As a result of, and specifically based upon, Defendants' fraudulent liquidated damages claim, significant amounts otherwise due to PCC and, in turn, PSI for work performed were withheld by Defendants from PCC and thereupon from PSI, for the past 5 years.

41. Due to the nature of Defendants' liquidated damages claim, PSI was forced to undertake substantial efforts in discovery and with experts to analyze and identify the actual causes of delay on the Project and to uncover the illegal conduct of Defendants relative to the withholding of the Certificate of Occupancy.

42. Over the course of the past 5 years, the parties have participated in a number of mediations in an effort to resolve the claims that are included in the State Court Litigation. The most significant claim in the State Court Litigation is, and has been, Defendants' fraudulent liquidated damages claim. Each of these mediations has failed to resolve any claim due to the inability to resolve Defendants' liquidated damages claim.

43. As a direct and proximate result of Defendants' filing of the improper and fraudulent liquidated damages claim, PSI has been forced to incur enormous legal and expert fees, costs and expenses.

## COUNT ONE – VIOLATION OF DUE PROCESS UNDER § 1983

44. PSI incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

45. Defendants Kelly and Grayem were, at all relevant times, acting as City employees under color of state law.

46. Defendants conspired to deprive PSI of its constitutionally protected due process rights.

47. PSI has a protected liberty interest in its reputation as a manufacturer and contractor, in its right to have the City properly execute its obligations relative to the issuance of Certificates of Occupancy and not to be harmed by the illegal and fraudulent conduct of the City and its personnel in withholding the issuance of the Certificate of Occupancy to gain financial leverage over PSI.

48. Defendants deprived, and/or caused the City to deprive, PSI of that liberty interest when they failed to timely issue the Certificate of Occupancy and conspired not to do so to gain financial leverage and/or for their own economic benefit.

49. Defendants further deprived, and/or caused the City to deprive, PSI of that liberty interest when they published to the world that PCC and its subcontractors, including PSI, had failed to complete the work in question for 345 days thereby entitling it to $10,695,000 in liquidated damages, which claims were false or misleading, permanently damaging PSI.

50. PSI has a protected property interest in funds owed to it for completed Project work and therefore in the City and Defendants Grayem and Kelly complying with applicable law and ordinary practice in the timely issuance of certificates of occupancy.

51. Defendants City, Grayem and Kelly knew that the liquidated damages provision of the CMR Contract was tied to "Milestone" dates, knew that there had been no "Milestone" date specifically identified in the approved schedule, but nevertheless supported the false position that such a Milestone had been established, knew that, at the time they allowed occupancy of Garage F, it qualified under the Ohio Building Code for the issuance of the Certificate of Occupancy, but nevertheless willingly joined in the conspiracy with the other Defendants to withhold the Certificate of Occupancy to gain leverage over PCC and PSI.

52. Defendants thereafter willingly used the existence of the fraudulent liquidated damages claim to withhold substantial compensation from PCC and understood full well that PCC would then withhold such substantial amounts from PSI.

53. Defendants deprived, and/or caused the City to deprive, PSI of its property interest in the proper and timely issuance of the Certificate of Occupancy when they instructed the withholding of funds owed to PCC and/or PSI based upon the fraudulently created liquidated damages claim.

54. Defendants failed to follow their own procedure or the applicable Ohio Building Code when they refused to issue the Certificate of Occupancy.

55. Defendants' conduct in continuing to refuse and failing to issue the Certificate of Occupancy in knowing violation of law during their ongoing and continuous occupancy of Garage F violated PSI's due process rights.

56. Furthering the unconstitutional deprivation, Defendants then improperly used the judicial process as a club to gain economic advantage over PCC and PSI, which conduct continued through 2017, 2018, 2019 and 2020.

57. Although illegal, Defendants' actions have not been unpredictable or random; to the contrary, Defendants schemed for months before putting their plan into action.

58. Nor were Defendants' actions unauthorized; to the contrary, Defendants obtained a stamp of approval from Defendant Kelly, the Mayor and the City Law Director through the authorization of the filing of the complaint and amended complaint in the State Court Litigation.

59. As a result of Defendants' malicious deprivations of PSI's clearly established due process rights, and conspiratorial withholding of millions of dollars in payments otherwise due, PSI has suffered the loss of reputation and business involving millions of dollars, entitling PSI to both compensatory and punitive damages against Defendants.

60. PSI is suffering ongoing and irreparable harm from its inability to demonstrate its entitlement to those Project funds and the continuing damage to its reputation from the false allegations relating to delays in the completion of the work.

## COUNT TWO – CIVIL CONSPIRACY UNDER § 1983

61. PSI incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

62. Defendants concocted an illegal plan in order to obtain financial leverage to cause PCC and/or PSI to compromise claims for compensation justly due and attributable to Defendants' delays and changes to the work on the Project and/or to achieve financial gain and/or benefit to which they were not otherwise entitled (the "Illegal Scheme").

63. Each Defendant agreed to implement the Illegal Scheme.

64. Upon information and belief, Defendants concocted the Illegal Scheme for one or more illegal purposes outside the scope of their employment, including to deflect attention from their own responsibility for cost overruns, avoid liability therefore and/or for their own financial gain and/or benefit.

65. Defendants knew that the Illegal Scheme, including its deprivation of PSI's due process rights, was unlawful.

66. In planning and implementing the Illegal Scheme, Defendants intended to violate PSI's constitutional right to due process of law under the Fourteenth Amendment.

67. Defendants engaged in multiple overt acts in furtherance of the conspiracy, including but not limited to:

   a. falsely claiming and asserting that the issuance of a Certificate of Occupancy was a Milestone Date applicable to Garage F;

   b. causing the City to fail to issue the Certificate of Occupancy as required by the Ohio Building Code;

   c. utilizing the threat of the assessment of liquidated damages as leverage against PCC and/or PSI to leverage a compromise of claims to compensation related to Defendants' delays and changes to the Project; and

   d. utilizing the court and judicial process for the improper purpose of presenting claims based upon the illegal withholding of the Certificate of Occupancy to assert a false claim for $10,695,000 in liquidated damages in order to create financial leverage against PCC and/or PSI.

68. Defendants' overt acts have severely and irreparably damaged, and continue to damage, PSI entitling PSI to an award of compensatory and punitive damages from Defendants.

## COUNT THREE – CIVIL CONSPIRACY

69. PSI incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

70. In plotting and implementing the Illegal Scheme, Defendants maliciously conspired together to illegally withhold the Certificate of Occupancy and tortiously interfere with PSI's contract with PCC.

71. Defendants planned and implemented their wrongful acts purposely, without reasonable or lawful excuse.

72. The Illegal Scheme, including the resulting tortious interference with PSI's business relationship with PCC, has caused PSI substantial and ongoing damages to its business and reputation, entitling PSI to an award of compensatory and punitive damages against Defendants.

## COUNT FOUR – ABUSE OF PROCESS

73. PSI incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

74. Defendants set in motion the complaint and amended complaint resulting in PCC's filing of its third party complaint against PSI.

75. As alleged, Defendants' inclusion of the fraudulent liquidated damages claim predicated upon the false Milestone Date and illegal withholding of the Certificate of Occupancy in the complaint was for the ulterior purpose of subversively leveraging against the otherwise proper claim of PCC and PSI for additional compensation arising from Defendants' delay and changes to the Project.

76. Defendants' abuse of process was intentional, egregious, reckless, malicious and gross, warranting an award of punitive damages.

77. Defendants ultimately "withdrew" their $10,695,000 false liquidated damages claim, but did so only after three years of litigation demonstrated that their Illegal Scheme had not had its desired result.

78. As a result of Defendants' abuse of process, PSI has been damaged in an amount in excess of $1,000,000.

## COUNT FIVE – MALICIOUS PROSECUTION

79. PSI incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

80. Defendants set in motion the complaint and amended complaint resulting in PCC's filing of its third party complaint against PSI.

81. As alleged, Defendants' inclusion of the fraudulent liquidated damages claim predicated upon the false Milestone Date and illegal withholding of the Certificate of Occupancy in the complaint was for the ulterior purpose of subversively leveraging against the otherwise proper claim of PCC and PSI for additional compensation arising from Defendants' delay and changes to the Project.

82. Defendants' complaint, and the inclusion of the fraudulent liquidated damages claim, had the effect of meaningfully interfering with PSI's possessory interest in property.

83. Defendants' malicious prosecution was intentional, egregious, reckless, malicious and gross, warranting an award of punitive damages.

84. Defendants ultimately "withdrew" their $10,695,000 fraudulent liquidated damages claim, but did so only after three years of litigation demonstrated that their Illegal Scheme had not had its desired result.

85. As a result of Defendants' abuse of process, PSI has been damaged in an amount in excess of $1,000,000.

## COUNT SIX – PUNITIVE DAMAGES

86. PSI incorporates by reference the allegations contained in the foregoing paragraphs as if fully rewritten herein.

87. PSI is entitled to an award of punitive damages against Defendants.

88. This action is a "tort action" for purposes of Ohio Revised Code § 2315.21.

89. Revised Code § 2315.21(C) provides that punitive or exemplary damages are recoverable from a defendant in a tort action if two conditions are met: (1) "[T]he actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud . . . .", and (2) "[T]he trier of fact has returned a verdict or has made a determination . . . of the total compensatory damages recoverable by the plaintiff from that defendant".

90. As alleged above, Defendants' actions and omissions demonstrate intentional malice toward PSI and/or aggravated or egregious fraud.

91. PSI is entitled to punitive damages in an amount to be proven at trial, and reasonably expected to exceed $1,000,000.

**WHEREFORE**, PSI requests that judgment be entered in its favor and against Defendants as follows:

A. A declaration that under the due process clause of the United States Constitution, made applicable through the Fourteenth Amendment and 42 U.S.C. § 1983, and under the due process clause of the Ohio Constitution contained in Article 1, § 16, the entire Illegal Scheme, including the fraudulent liquidated damages claim and the failure to issue the Certificate of

Occupancy, unconstitutionally deprived PSI of liberty and significant property interest without due process of law.

  B. Compensatory damages against Defendants, and each of them, in an amount to be determined at trial.

  C. Punitive damages from Defendants, and each of them, in an amount to be determined at trial, and reasonably expected to be in excess of $10,695,000.

  D. Attorneys' fees and costs.

  E. Any further relief as this Court may find just and equitable.

         */s/ Michael W. Currie*
         Michael W. Currie (00131000)
         Attorney of Record
         CURRIE & ASSOCIATES LLC
         250 N. Hartford Ave., Suite 300
         Columbus, Ohio 43222
         Telephone: 614.581.3276
         Email: mwclegal@yahoo.com
          *Attorney for Plaintiff, Prestress*
          *Services Industries, LLC*

## **JURY DEMAND**

PSI hereby demands trial by jury on all applicable issues, claims and/or defenses.

         */s/ Michael W. Currie*
         *Attorney for Plaintiff, Prestress Services Industries, LLC*